WORRALL v. DAVIS COAL & COKE CO. et al.

(District Court, S. D. New York. January 21, 1902.)

1. EVIDENCE—DOCUMENTS—SHIP'S LOG BOOK.

It is doubtful if the mere inspection of a ship's log book by the adverse party against whom it is produced and sought to be used renders it competent evidence for the party who made it.

2. SHIPPING—CONSTRUCTION OF CHARTER—DUTY OF VESSEL TO PROVIDE AGAINST DAMAGE FROM USUAL METHOD OF LOADING.

The owner chartered a steamship, by a time charter, to be employed in carrying lawful merchandise, for which she was warranted in every way fitted. The owner agreed to maintain her in a thoroughly efficient condition during the service, and it was stipulated that the hire should cease during time lost by reason of her becoming unfit, if exceeding 24 hours. The charterer subchartered her, and she was again subchartered for two voyages to carry cargoes of iron ore from Cuba to an American port. In the loading of the first cargo she received some slight injury, particularly to her hatch coamings and their appurtenances, and in loading the second time more serious injury, which rendered her unseaworthy, and made it necessary to make repairs after her discharge, which occupied five days. The owner brought suit against the charterer to recover charter hire during such five days, and the cost of the repairs, and by petition of respondent the subcharterers were both brought in. It appeared that the ore was loaded in the usual manner, by means of chutes, and that the injuries received, beyond those which were to be expected from the character of the cargo, which was necessarily hard on ships, resulted from the fact that the ship was not constructed in the best manner to receive such cargo, and that the master failed to take such measures as he might have done, and as were customary, to protect the deck and hatchways. *Held*, that the subcharterers were protected from liability for injuries due to such causes by the subcharters, which warranted the ship to be in every way fitted for that particular service; that the original charterer was also protected, the service being a lawful one, in which he was authorized by the charter to engage the vessel, and the ordinary risks from which were assumed by the owner, and hence it was not liable either for the cost of the repairs, or for charter hire during the time they were being made.

In Admiralty. Suit to recover charter hire and for damages to vessel.

Convers & Kirlin, for libelant.

Wing, Putnam & Burlingham, for Davis Coal & Coke Co.

Butler, Notman, Joline & Mynderse, for the United States Shipping Co. and the Spanish-American Iron Co.

ADAMS, District Judge. The libel was filed herein to recover against the Davis Coal & Coke Company a balance of hire of the steamer, amounting to $1,043.96, under a charter party dated at New York the 28th day of June, 1900, between the owners of the steamer and the Davis Coal & Coke Company, called hereinafter, for convenience, the "Davis Company," and for the cost of certain repairs to the steamer, amounting to $770.37, alleged to have been rendered necessary by the manner in which she was employed. The Davis Company brought in the other respondents by petition.

The material parts of the charter party are as follows:

"Witnesseth, that the said owners agree to let, and the said charterers agree to hire, the said steamship, from the time of delivery, for about (3) three calendar months. Steamer to be placed at the disposal of the charterers at Baltimore, Md., * * * and being, on her delivery, ready to receive cargo, and tight, staunch, strong, and in every way fitted for the service, * * * to be employed in carrying lawful merchandise, including petroleum or its products, in cases, within the following limits: Any safe port in United States, West Indies, Mexico, and/or Carribbean Sea, as the charterers or their agents shall direct,—on the following conditions: (1) That the owner shall * * * maintain her in a thoroughly efficient state in hull and machinery for and during the service. * * * (4) That the charterers shall pay for the use and hire of the said vessel (£1,260) twelve hundred and sixty pounds British sterling per calendar month, commencing on and from the day of her delivery as aforesaid, and at and after the same rate for any part of a month; hire to continue until her delivery in like good order and condition to the owners (unless lost) at a port in the United States north of Hatteras. * * * (7) That the cargo or cargoes to be laden and/or discharged in any dock or at any wharf or place that the charterers or their agents may direct, provided the steamer can always safely lie afloat at any time of tide. * * * (9) That the captain shall prosecute his voyages with the utmost dispatch, and shall render all customary assistance with ship's crew and boats. That the captain (although appointed by the owners) shall be under the orders and direction of the charterers as regards employment, agency, or other arrangements; and the charterers hereby agree to indemnify the owners from all consequences or liabilities that may arise from the captain signing bills of lading, or otherwise complying with the same. (10) That if the charterers shall have reason to be dissatisfied with the conduct of the captain, officers, or engineers, the owners shall, on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments. * * * (12) That the master shall be furnished from time to time with all requisite instructions and sailing directions. * * * (16) That in the event of loss of time from deficiency of men or stores, breakdown of machinery, stranding, or damage preventing the working of the vessel for more than twenty-four consecutive working hours, the payment of hire shall cease until she be again in an efficient state to resume her service. * * * (23) That the owners are to provide ropes, falls, slings, and blocks necessary to handle ordinary cargo up to two tons (of 2,240 lbs. each) in weight; also lanterns for night work. Charterers to provide necessary dunnage and shipping boards, but owners to allow them the use of the dunnage and shipping boards already on board the steamer."

The material parts of the libel are as follows:

"Third. Under and pursuant to the terms of this charter party the said steamship Acanthus was delivered to and taken over by the charterer at

Baltimore on the 9th day of July, 1900, and entered upon the performance of the said charter party; being at the time classed 100 A1 at British Lloyd's, and tight, staunch, and strong, and in every way fitted for the service. During the life of the said charter party; and pursuant to orders received from the said charterer, she proceeded to Daiquiri, Cuba, where she arrived on August 11, 1900, and there loaded a cargo of iron ore from the Spanish-American Iron Company, to whom as the libelant is informed and believes the said steamer had been subchartered by the respondent. Solely by reason of the careless, reckless, and negligent manner in which the said cargo was put aboard by the said Spanish-American Iron Company, notwithstanding the protests of the master, and without fault on the part of the steamship or her officers, the said steamship Acanthus sustained some damage, particularly to her hatch coamings and their appurtenances. Subsequently, and during the life of the said charter party, and upon the orders of the said charterer, the said steamship Acanthus proceeded a second time to Daiquiri, Cuba, arriving there on September 25, 1900, and received a cargo of iron ore from the Spanish-American Iron Company, to whom, as the libelant is informed and believes, the said steamer had again been subchartered by the respondent. Solely by reason of the careless, reckless, and negligent manner in which the said cargo was loaded by the said company, notwithstanding the protests of the master, and without fault on the part of the steamship or her officers, the said steamship Acanthus sustained considerable further damage to the decks, coamings, and other parts of her structure.

"Fourth. The said steamship Acanthus duly proceeded to the port of Baltimore, to which she had been ordered with the said cargo so loaded, and on the discharge of the said cargo a survey was held upon the said vessel; and the master was informed by Lloyd's surveyor that said steamship Acanthus was unseaworthy, because of the aforesaid damages, and would not be allowed to leave port unless repairs were made to the portions of the vessel damaged as above set forth. That accordingly the said repairs were immediately begun, on the 5th day of October, 1900, and were concluded on the 10th day of October, 1900. That the cost of such repairs had been the sum of $750, and the cost of such survey $20.37, making in all $770.37, no part of which has been paid by the respondent, although due demand therefor has been made.

"Fifth. The said steamship Acanthus was redelivered to the owners in New York on the 19th day of December, 1900, but the respondent has withheld and deducted from the charter hire the sum of £215.5.0., or, in money of the United States, $1.043.96, as and for the time occupied in repairing the damage above set forth, and has refused to pay the same, although due demand therefor has been made.

"Sixth. The cost of such repairs and the charter hire for the time so withheld are a charge upon the respondents, and not upon the owners of the vessel, according to the terms of the charter party hereinbefore set forth, providing that the hire of the said vessel was to continue until her delivery to the owners in the like good order and condition in which she had entered on the performance of the charter party."

The respondent the Davis Company excepted to the libel, and answered (the immaterial parts being omitted) as follows:

"(1) Because it states no cause of action against the respondent, inasmuch as, under the terms of the charter party exhibited in this case, no hire was due during the time that the steamship Acanthus was unseaworthy, and while not in an efficient state to resume her service; and, further, that the alleged damage sustained by said steamer that made her unseaworthy is set forth to have been by the careless, reckless, and negligent manner in which the cargo was put aboard by the Spanish-American Iron Company (article 3), for whose actions this respondent is in no wise responsible.

"(2) In that it does not appear that on the 19th day of December, 1900, when the steamship Acanthus was redelivered to the owners in New York

(article 5), the steamship was not in the like good order and condition as when originally chartered to the respondent.

"(3) That under clause 16 of the charter party, providing for 'damage preventing the working of the vessel for more than 24 consecutive working hours, the payment of hire shall cease until she be again in an efficient state to resume her service,' the respondent was entitled to withhold and deduct from the charter hire the sum of £215. 5s. ($1,043.96) as and for the time thus agreed to be off hire, and that no claim therefor can be made on this respondent under the terms of said contract.

"Without waiving the foregoing exceptions, but insisting upon all and every thereof, this respondent makes answer unto said libel as follows:
* * *

"Third. This respondent also admits that, on or about the 9th of July last, the said steamship entered upon the performance of said charter party, and was accepted by the charterer, by whom she was subchartered to the United States Shipping Company, a corporation of New Jersey, by whom said vessel was again let unto the Spanish-American Iron Company,—the same corporation named in the third article of the libel. This respondent further admits that it has now just learned, by the perusal of the libel herein, that on or about the 11th of August, 1900, while the Acanthus was loading a cargo of iron ore from said Spanish-American Iron Company, she received some damage, either through the manner in which the said cargo was taken on board, or from the unfitness and weakness of her hatch coamings to receive iron ore, but that no intimation thereof was ever given to this respondent, except by the filing of the libel herein. Further answering, this respondent admits that it did receive notice that on the second trip to Daiquiri the master did claim that his vessel had received certain damage in and about the hatches in the loading of said cargo, but as to the facts thereof this respondent has no knowledge, having no representative at Daiquiri, and having had no control over the said vessel, or over the parties then engaged in loading cargo on board thereof.

"Fourth. This respondent admits that the steamship arrived at Baltimore, and that on the discharge of her cargo it was notified that Lloyd's surveyor had pronounced the Acanthus unseaworthy because of the state of her hatches, and the coamings thereof, and would not allow her to leave port until they could be made efficient so as to carry general cargo. This respondent also admits that repairs were being made from the 5th to the 10th of October, 1900. This respondent has no knowledge as to the cost of such repairs, and it alleges that the same have been formally demanded from it, although such claim was presented to the respondent to be passed over to the Spanish-American Iron Company.

"Fifth. This respondent admits that the said steamship was redelivered to the owners in New York on or about the 19th of December, 1900; that it has not paid the charter hire during the time that the vessel was repairing and was off hire under the charter party."

The respondent the Davis Company also filed a petition, the material parts of which are as follows:

"Second. On the afternoon of December 24, 1900, the New York agent of this petitioner was served with process of this honorable court, citing it to appear on January 1st next, and answer unto a libel against this respondent filed by the above-named John P. Worrall, as master of the steamship Acanthus, for $770.37, costs of repairs made to said vessel, together with £215. 5s. 0d., or, in United States money, $1,043.96, as hire for the time occupied in repairing such damage. The petitioner is sued as charterer of said vessel, under a time charter annexed to said libel. bearing date the 28th day of June, 1900.

"Third. In said libel it is alleged (article 3): 'During the life of the said charter party, and pursuant to orders received from the said charter, she proceeded to Daiquiri, Cuba, where she arrived on August 11, 1900, and there loaded a cargo of iron ore from the Spanish-American Iron Company, to whom as libelant is informed and believes the said steamer had been subchartered by the respondent. Solely by reason of the careless, reckless,

and negligent manner in which the said cargo was put aboard by the said Spanish-American Iron Company, notwithstanding the protests of the master, and without fault on the part of the steamship or her officers, the said steamship Acanthus sustained some damage, particularly to her hatch coamings and their appurtenances. Subsequently, and during the life of the said charter party, and upon the orders of the said charterer, the said steamship Acanthus proceeded a second time to Daiquiri, Cuba,—arriving there on September 25, 1900,—and received a cargo of iron ore from the Spanish-American Iron Company, to whom, as the libelant is informed and believes, the said steamer had again been subchartered by the respondent. Solely by reason of the careless, reckless, and negligent manner in which the said cargo was loaded by the said company, notwithstanding the protests of the master, and without fault on the part of the steamship or her officers, said steamship Acanthus sustained considerable further damage to the decks, coamings, and other parts of her structure.'

"Fourth. It is also in said libel alleged that by reason of such damage the said steamship was pronounced unseaworthy, and the repairs to the same were made in Baltimore from the 5th of October, 1900, to and including the 10th of October, 1900, and that the cost of the same was the sum of $770.37. Under the terms of the charter party to this respondent, copy of which is annexed to the libel, it was provided (clause 16) 'that in the event of loss of time from deficiency of men or stores, breakdown of machinery, stranding, or damage preventing the working of the vessel for more than twenty-four consecutive working hours, the payment of hire shall cease until she be again in an efficient state to resume her service,' and that accordingly the respondent did withhold and deduct from the charter hire of the vessel the sum of £215. 5s. 0d. during the time of such repairs, and until the said steamship had been made seaworthy and fit to resume her service.

"Fifth. This respondent had no direct privity or knowledge in regard to the loading of said steamship at Daiquiri upon the times mentioned in the libel, and is unable to admit or deny the same. On both of said times the respondent had subchartered the said steamship unto the United States Shipping Company, a corporation of New Jersey, by whom the Acanthus had been again subchartered to the Spanish-American Iron Company,—the same corporation named in said libel,—who had sole charge of the loading and dispatch of the steamer Acanthus at Daiquiri on both occasions mentioned in the libel.

"Sixth. Upon receiving notice from the libelant that he claimed the steamship Acanthus had sustained damage while loading at Daiquiri, which notice was first communicated to the respondent on or about October 4th last, the respondent passed the same over to its subcharterer, the United States Shipping Company, and requested information concerning the same, to which the United States Shipping Company replied in writing, denying liability, and alleging that, if any such damage was sustained, the Spanish-American Iron Company was alone responsible, as appears by a copy of said letter hereto annexed, marked 'A,' to be taken as part of this petition.

"Seventh. These claims now put forward against this petitioner, having arisen primarily between the vessel and the said Spanish-American Iron Company, require that the company be brought in to defend this suit; and as this petitioner has no direct contract with the Spanish-American Iron Company, save by its subcharter to the United States Shipping Company, the United States Shipping Company is also a necessary party defendant herein. Thereby this court will have all parties before it, so that its decree herein may be effectual to do final and complete justice and settle the ultimate liability of the party in fault, if anything should be found due the libelant for the causes of action stated in the libel.

"Eighth. The Spanish-American Iron Company is a corporation of West Virginia, but transacts business in New York, at No. 26 Broadway, where it has an office and general manager. The United States Shipping Company is a corporation of New Jersey, but has its general office in New York, in the Produce Exchange Annex Buildings, where are also its president and executive offices."

The United States Shipping Company, hereinafter called the "Shipping Company," answered the libel, the material parts being as follows:

"First. Heretofore, to wit, on or about the 27th day of December, 1900, the Davis Coal & Coke Company theretofore proceeded against upon the libel of John P. Worrall, master of the British steamship Acanthus, filed its petition in this court, praying that this respondent, to wit, the United States Shipping Company, might be cited to appear and answer unto said libel and unto said petition, which said prayer was granted by this court, and a citation issued accordingly. * * *

"Third. This respondent, upon information and belief, admits that the steamship Acanthus loaded a cargo of iron ore from the Spanish-American Iron Company in Daiquiri, Cuba, on or about August 11, 1900, and a second cargo of iron ore on or about September 25, 1900, as alleged in article 3 of the libel. This respondent alleges that at said times said steamer had been furnished to said Spanish-American Iron Company by this respondent, and not by the Davis Coal & Coke Company, as alleged in said article of the libel.

"Fourth. Further answering the libel herein, the respondent alleges that the authority under which it furnished the steamer Acanthus to the Spanish-American Iron Company for the first cargo of iron ore as aforesaid was derived from a charter party entered into on the 1st day of August, 1900, between the Davis Coal & Coke Company, therein named, as chartered agents for the owners of said steamship, and this respondent, in and by which said charter party it was provided, among other things: '(1) That said steamship, being warranted tight, staunch, and strong, and in every way fitted for the voyage, shall, with all convenient dispatch, proceed in ballast, unless otherwise permitted by charterers, to Daiquiri, Cuba, and there load, as customary, always afloat, as directed, in the customary manner, from the charterers' agents or shippers, a full and complete cargo of ore, not exceeding what she can reasonably stow and carry over and above her tackle, apparel, provisions, fuel, and furniture, say about 3,800 tons,— no ore to be carried in the bunkers,—and, being so loaded, shall therewith proceed to Baltimore direct, and deliver the same as customary, in good order, where and as directed by the consignees, always afloat.' And the respondent further alleges that the authority under which it furnished the steamer Acanthus to the Spanish-American Iron Company for the second cargo of iron ore as aforesaid was derived from a charter party entered into on the 21st day of August between the Davis Coal & Coke Company, therein named, as chartered agents for the owners of said steamship, and this respondent. The said charter party for the second cargo of iron ore aforesaid contained the same clause above quoted, in identical language.

"Fifth. This respondent further alleges, upon information and belief, that the charter parties aforesaid executed by the Davis Coal & Coke Company, as chartered agents for the owners, were duly ratified by the owners of said steamship, and that, if the steamship Acanthus sustained any damage at the times mentioned in the libel, such damage was due to the fact that the steamship Acanthus was not properly constructed, equipped, and provided for the transportation of cargoes of iron ore, and that the hatchways, hatch coamings, angle irons, holds, and shaft tunnel were not protected, by the use of planks and dunnage, against injury.

"Sixth. Further answering the libel herein, the respondent alleges, upon information and belief, that the steamship Acanthus, at the times mentioned in the libel, was loaded in a suitable, proper, and customary manner, and sustained no damage other than ordinary wear and tear."

The Shipping Company also answered the petition, the material parts being as follows:

"Second. This respondent admits that the averments of the libel set forth and referred to in articles 3 and 4 of said petition are therein correctly stated.

"Third. This respondent admits the matters alleged in article 5 of said petition.

"Fourth. This respondent has no knowledge as to when the notice of the libelant's claim for damages sustained by the steamship Acanthus was received by the Davis Coal & Coke Company; but it admits that said notice was passed over to this respondent, to wit, on or about October 6, 1900, with a request for information concerning the same. This respondent admits the other matters alleged in article 6 of said petition.

"Fifth. This respondent has no knowledge as to the matters alleged in article 7 of said petition, but admits those alleged in article 8 thereof.

"Sixth. This respondent has no knowledge as to whether all the premises of said petition are true, but admits that they are within the admiralty and maritime jurisdiction of this honorable court.

"Seventh. Further answering the petition herein, this respondent alleges that the charter parties to this respondent referred to in article 5 of the petition herein were executed by the petitioner, the Davis Coal & Coke Company, on the 1st day of August, 1900, as to the first cargo of iron ore mentioned in the libel, and upon the 21st day of August, 1900, as to the second cargo of iron ore mentioned in the libel, and that each of said charter parties provided, among other things, as follows: '(1) That said steamship, being warranted tight, staunch, and strong, and in every way fitted for the voyage, shall, with all convenient dispatch, proceed in ballast, unless otherwise permitted by charterers, to Daiquiri, Cuba, and there load, as customary, always afloat, as directed, in the customary manner, from the charterers' agents or shippers, a full and complete cargo of ore, not exceeding what she can reasonably stow and carry over and above her tackle, apparel, provisions, fuel, and furniture, say about 3,800 tons,—no ore to be carried in the bunkers,—and, being so loaded, shall therewith proceed to Baltimore direct, and deliver the same as customary, in good order, where and as directed by the consignees, always afloat.'

"Eighth. This respondent further alleges, upon information and belief, that the steamship Acanthus was not adapted to the carrying of cargoes of iron ore, in that said vessel was constructed with between-decks, and otherwise improperly constructed for said purpose, and in that said vessel was improperly equipped and provided for the transportation of cargoes of iron ore, and in that the hatchways, hatch coamings, angle irons, holds, and shaft tunnel of said vessel were not protected, by the use of planks and dunnage, against injury; and the respondent thereupon avers that if, during the loading of the cargoes referred to in the libel, said vessel sustained any damage, said damage was due to the defects aforesaid.

"Ninth. Further answering the petition, this respondent alleges, upon information and belief, that at the times mentioned in the libel and in the petition the steamship Acanthus was loaded in a suitable, proper, and customary manner, and sustained no damage other than ordinary wear and tear."

The Spanish-American Iron Company, hereinafter called the "Spanish Company," answered the libel, the material parts being as follows:

"First. Heretofore, to wit, on or about the 27th day of December, 1900, the Davis Coal & Coke Company, theretofore proceeded against upon the libel of John P. Worrall, master of the British steamship Acanthus, filed its petition in this court, praying that this respondent, to wit, the Spanish-American Iron Company, might be cited to appear and answer unto said libel and unto said petition, which said prayer was granted by this court, and a citation issued accordingly. * * *

"Fourth. This respondent has no knowledge as to the delivery of the steamship Acanthus to the charterer, the Davis Coal & Coke Company, on the 9th day of July, 1900, or as to the classification or condition of said vessel at said time. It admits that on the 11th day of August, 1900, the steamship Acanthus arrived at Daiquiri, Cuba, and there loaded a cargo of iron ore from this respondent, to which said steamer had been subchartered; but it alleges that said steamer was chartered to this respondent by the United States Shipping Company, and not by the Davis Coal & Coke

Company, as alleged in the libel. This respondent alleges that said vessel was loaded in a suitable, proper, and customary manner, and it denies that said loading was careless, reckless, or negligent, and it denies that any protest whatsoever was made by the master of said vessel. This respondent has no knowledge, nor any information sufficient to form a belief, as to any damage whatever sustained by said vessel at said time; and it alleges that no notice or claim that such damage had occurred was brought to its attention or to that of its officers or employés, prior to the filing of the libel herein. This respondent denies that, in case said vessel sustained damage at said time, said damage was without fault on the part of the steamship or her officers. This respondent admits that the steamship Acanthus proceeded a second time to Daiquiri, Cuba, arriving there on September 25, 1900, and that said vessel again received a cargo of iron ore from this respondent, to which said vessel had been subchartered by the United States Shipping Company as aforesaid. This respondent alleges that said vessel was loaded in a suitable, proper, and customary manner, and it denies that said loading was careless, reckless, or negligent, and it denies that the damage sustained by the vessel at said time, if any such damage there was, occurred without fault on the part of the steamship or her officers. This respondent alleges that no protest or complaint as to the manner of loading, or as to any damage sustained by the vessel, was made until about 3 p. m., when the master of said steamship stopped the loading and complained that his vessel was being damaged. After a detention of about forty minutes said loading was resumed, and was completed on the morning of the following day. This respondent denies that said vessel sustained any damage after 3 p. m. of September 25, 1900, but it has no knowledge as to whether any damage occurred on said day earlier than said hour. It alleges that such damage, if any, was trifling. * * *

"Seventh. Further answering the libel herein, the respondent alleges that the steamship Acanthus, upon the voyage mentioned in the libel, was furnished to it under the terms and provisions and subject to the conditions of an agreement or charter party entered into on the 30th day of September, 1897, between the United States Shipping Company, therein referred to as the 'Shipping Company,' and this respondent, therein referred to as the 'Mining Company,' in and by which said agreement or charter party it was provided, among other things: '(1) Ships to be furnished at regular intervals specified by the Mining Company; the latter giving the Shipping Company reasonable notice; and the Shipping Company warrants that all steamships to be employed in this traffic shall be tight, staunch, and strong, and in every way fitted for the voyage. The Shipping Company also agrees to furnish steamships, the construction of which is suitable for this trade, and approved by the Mining Company. * * * (19) Any damage suffered by a vessel in loading or discharging shall be borne by the vessel, unless due to negligence or fault on the part of the Mining Company.'

"Eighth. This respondent further alleges, upon information and belief, that the steamship Acanthus was not adapted to the carrying of cargoes of iron ore, in that said vessel was constructed with between-decks, and otherwise improperly constructed for said purpose, and in that said vessel was improperly equipped and provided for the transportation of cargoes of iron ore, and in that the hatchways, hatch coamings, angle irons, holds, and shaft tunnel of said vessel were not protected, by the use of planks and dunnage, against injury; and the respondent thereupon avers that if, during the loading of the cargoes referred to in the libel, said vessel sustained any damage, said damage was due to the defects aforesaid."

The Spanish Company also answered the petition, the material parts being as follows:

"First. This respondent admits the matters alleged in articles 1, 2, 5 and 8 of said petition.

"Second. This respondent admits that the averments of the libel set forth and referred to in articles 3 and 4 of said petition are therein correctly stated.

"Third. This respondent admits that it has no direct contract with the Davis Coal & Coke Company, but as to the other matters alleged in articles 6 and 7 of the petition it has no knowledge, and it neither admits nor denies the same.

"Fourth. This respondent has no knowledge as to whether all and singular the premises of said petition are true, but admits that they are within the admiralty and maritime jurisdiction of this honorable court."

The question for consideration is whether the vessel was damaged at Daiquiri in such a manner as to entitle the libelant to repair her at the expense of the respondents, or of any of them. If that is determined in the affirmative, the hire continued during the period necessary for such repairs, and the libelant is entitled to recover in both respects; otherwise the steamer was off hire during the period, and there cannot be a recovery in either respect.

At the trial the question as to the admissibility of the steamer's log book was raised. It was offered by the libelant, objected to by the respondents, and received subject to the objection. It appears that its production was asked for by the proctors for the Shipping Company and the Spanish Company at the time of the taking of the deposition of the master of the ship. It was not then produced, but it was produced during the examination, which immediately followed, of the first officer, who kept it, and it was marked in evidence as an exhibit for the libelant. The log book was then subject to the respondents' use, if they wished to examine it; and it appears by the admission of the proctors for the Shipping Company and Spanish Company that they did examine it, but too late for cross-examination of the witnesses in connection with it. It is well established that a log book is not ordinarily receivable in evidence in favor of the persons concerned in making it, except in a few cases relating to seamen, provided for by statute. I Greenl. Ev. § 495. It is not necessary to decide here the vexed question whether an inspection by the other party after a production at the time of the trial upon a subpœna duces tecum makes it evidence for the one producing it. Edison Electric Light Co. v. U. S. Electric Lighting Co. (C. C.) 45 Fed. 55, 59; Smith v. Rentz, 131 N. Y. 169, 30 N. E. 54, 15 L. R. A. 138. I doubt if a mere inspection of a log book by the party against whom it is sought to be used makes it evidence for the party who made it, but, under the circumstances of the case, I have examined this one. I do not see that it adds anything to the testimony of the officers, but regard it as corroborative of their statements.

The steamer was delivered to the Davis Company in Baltimore on July 29, 1900, at 9 o'clock a. m. She was classed 100 A1; having passed her second Lloyd's survey in November, 1899, at South Shields, at which time some $2,000 were spent upon her. At the time of her delivery she was in good order, and all the hatch coamings were in good condition. She was accepted by the Davis Company as being in accordance with the contract, and subchartered by it to the Shipping Company, which subchartered her to the Spanish Company. The subcharters were in substantial conformity with the allegations of the pleadings, and thereunder the steamer made two trips to Daiquiri, Cuba, where she was loaded with iron ore,

which she delivered in Baltimore, Md. Upon the occasion of her first loading at Daiquiri, the libelant claimed that some damage was done thereby to the angle irons of the hatch coamings, but it was not of serious consequence, and the claim therefor in the libel was not pressed upon the trial. Upon the second loading, however, it was claimed that such serious damage was done that the vessel was rendered unseaworthy thereby, and that in consequence the repairs which are the subject of dispute were necessarily made in Baltimore. On the other hand, the respondents contend that the vessel was not damaged in the loading beyond the ordinary wear and tear incidental to the loading of iron ore, and that the steamer's owners were bound to repair the damage, under the terms of the charter party. That there was considerable damage admits of no dispute. A survey was called in Baltimore for the purpose of ascertaining the extent of the damage, and Lloyd's surveyor recommended certain repairs to the coamings, etc., which he testified were necessary to render the steamer seaworthy. I accept this testimony as controlling upon the condition of the steamer, and conclude that the damage exceeded ordinary wear and tear. The question remains whether the excess of damage could have been prevented by the use of proper precautions on the part of the steamer at the time of loading. The surveyor mentioned (libelant's witness) testified that, even with coal cargoes, it was usual for a steamer receiving them to take preventive measures in the way of coverings for the coamings and other parts liable to injury, and that, iron ore being a harder cargo to receive, greater precautions were necessary in such cases. The loading at Daiquiri was from an ore dock projecting about 500 feet out into the bay. There were 12 ore pockets located near the outer or northerly end of the dock, about 20 feet apart. Each pocket had an iron chute, semicircular in shape, about 25 or 30 feet long, and 2½ feet wide, attached to it at its lowest point. These chutes were fed through openings in the pockets immediately over them. The pockets were at two elevations; a part having their orifices about 32–35 feet above the water; the other being tapped at an elevation of about 22–25 feet above the water. The ore passed through these pockets into the chutes, and thence into the vessel. A part of the loading apparatus was a large square sheet of iron, called a "devil," which was suspended by the ship's tackle in the center of the hatchway, opposite the mouth of each chute, and served to break the force of the fall of the ore, and to distribute it in the hold of the vessel. Ordinarily it was necessary to use the upper chutes first in loading, because the vessels would be too high out of the water for the use of the lower chutes, which were brought into requisition when cargo enough was taken in by means of the upper chutes to bring the vessel down in her bearings to the necessary depth for the lower chutes. The rise and fall of the tide at Daiquiri is only about 18 inches, so that no substantial difference is made by its state. The testimony is to the effect that this method of loading iron ore is generally adopted in this country and Cuba, and is one to which vessels undertaking to carry iron ore are expected to have in view when chartering for such trade. Notwithstanding precautions taken by vessels to pro–

tect themselves, some slight damage to the hatch openings, amounting to $50 or $75, usually occurs on each occasion, and is borne by the vessel. I am inclined to the opinion that the excess of damage in this case, over ordinary wear and tear, was caused by the absence of proper precautions on the part of the vessel, or at least there is no satisfactory proof to the contrary, and not by any negligent loading on the part of the shipper, which used the ordinary method. During the loading the captain of the vessel complained to the shipper that the vessel was being injured, and the loading was temporarily suspended. The shipper's agent, in reply to the complaint, wrote to the master that they were "loading the vessel in the usual manner. In case you find any damage to her, please write me a letter detailing the same, and I will forward the same to our New York office, where such claims are adjusted." The master sent such a letter to the agent, and the loading then went on again without further objection on the master's part, who appears to have relied upon his complaint and the letters to cover any damage the vessel might receive. It would have been better if the master, being advised of the probability of damage by his experience on the first loading and what was taking place at the second loading, had endeavored to protect his vessel by suitable devices, such as covering the coamings and other places where the ore would strike by old chains, boards, and planks, as was sometimes done on vessels which were being loaded at this dock. And apart from the practice, ordinary care on the part of the vessel would have required some attempt to prevent the damage, which was entirely neglected. The duty of prevention belonged to the ship. Olivari v. Merchant (D. C.) 18 Fed. 554. Moreover, this steamer was of a different type from those usually employed in the trade, in that she had between-decks, which received the principal part of the damage, and probably had some effect in producing damage to the upper coamings and other parts, through a difficulty of distributing the ore by the usual means. Such fact was necessarily influential in exonerating the Shipping Company and the Spanish Company, which were entitled by their subcharters from the Davis Company to a vessel suitable for their trade. I find that they are not liable.

As to the Davis Company, it was entitled to the use of the vessel in "carrying lawful merchandise" within the limits in which she was to be used, and in subchartering for the iron trade it was acting within its legal rights. Such trade is a hard one on vessels, but iron ore is not unlawful merchandise. If the steamer's owners had wished to exclude such use of their vessel, they should have procured a stipulation to that effect to be included in the contract. The fact that the vessel would be subjected, by reason of the character of the ore and the method of loading, to more than the ordinary wear and tear incident to other cargoes, was known to the master when he entered upon the performance of the second voyage. It is evident that, from what he ascertained upon the first voyage, he did not then consider the proposed use of the vessel as improper, and it was incumbent upon him to take adequate means to adapt her to the contingencies of the trade. If he had done so, and endeavored by some

proper means to avert or minimize the danger of damage, and it nevertheless had occurred, he would now be in a better position to assert the claim of negligent loading. I also find that there is no liability on the part of the Davis Company.

Libel and petition dismissed, with costs to the Davis Company against the libelant, and with one bill of costs to the Shipping Company and the Spanish Company against the Davis Company.